# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed February 8, 1902.

THE BALTIMORE HIGH GRADE BRICK COMPANY OF BALTIMORE CITY

VS.

JAMES W. AMOS ET AL.

*Gans & Haman* and *S. S. Field* for plaintiff.

*John P. Poe, Wm. A. Fisher, Willis, Homer, France & Smith, Moses R. Walter, Moses Sonnchill, Robert H. Carr, Jr.,* and *John E. Dempster* for defendants.

DENNIS, J. —

The plaintiff is a creditor of James W. Amos for the sum of $13,852.85 for bricks furnished by the said Amos, which bricks were used in the construction of forty-nine houses on Twenty-second street and the York road. Payment for these bricks was also guaranteed by Frank O. Singer, Jr., one of the defendants.

The bill seeks to have three mortgages upon certain of the lots upon which these buildings were erected, from one Devilbiss to the defendants, Spalding and Singer, set aside, and to have the assignment by Singer of his interest under said mortgages to the defendant, Savage, set aside; and to have the fee-simple and leasehold interest in the property mentioned declared chargeable with the payment of the plaintiff's claim.

Under an agreement filed in the case, by which the mortgages were allowed to be foreclosed and a bond executed, the above questions were the only ones left of the numerous ones raised by the bill and amendment for decision.

Subsequently, on November 19, 1898, another bill was filed by this same plaintiff against Singer, Spalding, Savage and Amos, alleging that the creation of the ground rents was also fraudulent, and claiming that the plaintiff, as a creditor of Singer, was entitled to a decree vacating certain conveyances of the ground rents issuing out of these lots, and for a sale and application of the proceeds to the payment of the plaintiff's claim; and further claiming, as it also does in the present bill, that these defendants were partners and as such liable to the plaintiff.

This last bill was brought to a hearing before Judge Stockbridge, in May, 1899, long before the present suit was matured, and by him the bill was dismissed. This decree must be treated as a conclusive adjudication that the contention that the transactions relating to the ground rents were fraudulent, and that the defendants were liable as partners, were adjudged to be not sustained.

The real substantial question now before the court, is as to the validity of the creation of these ground rents and the mortgages; the plaintiff contends both are fraudulent in fact, and also that the mortgages are fraudulent in law, because, 1st, the affidavit is false, 2nd, they are advance mortgages within the prohibition of the Code, and 3rd, that they are void under the Statute of Elizabeth.

I. Are these leases and mortgages void as being fraudulent in fact?

In all this voluminous record, I do not find a single fact to sustain this contention. Without reciting the scheme of the transaction, it is sufficient to say that it was one entirely common, and familiar to any one acquainted with building operations in this city.

One of the main grounds relied on by the plaintiff to support the charge of fraud—indeed it seems to be the pivotal fact upon which he rests this theory of his case—is the fact that Devilbiss, to whom the leases were made, was an irresponsible man and wholly without means.

But there is nothing unusual about this; on the contrary, it is well known that it is the common practice when building undertakings are entered upon in this city to have the leases made to an irresponsible party, in order to avoid the perpetual liability on the personal covenants. Amos distinctly gives this as one of the reasons why the leases were not taken in his own name; and he gives as another that, by having the leases taken in the name of Devilbiss, he could, from time to time, get the promissory notes of Devilbiss to his order, which he could endorse over to the material men, who could get them discounted in bank. Amos also testifies that Vice-President Wilson, of the plaintiff company, had actual notice that the leases were made to Devilbiss, and of the exact condition of the title, and also that he knew that Devilbiss was only acting for Amos, and that Amos was the real man in the trans-

action. Certainly he had constructive notice, for he never made the contract with Amos for these bricks until after the first of the leases and mortgages had been executed and duly placed on record; and even without this express testimony as to his actual knowledge, it is difficult to believe that a man like Mr. Wilson, who had had so many transactions with builders under building contracts similar to the one in question, could have been ignorant of the real nature of the transaction. It is not claimed that he gave credit to Amos, because of any relation that Devilbiss had to the transaction or because the leases stood in his name; but on the contrary, after the lease had been recorded, as also the mortgage back, he entered into a written contract with Amos to furnish the bricks, obtaining from Singer a personal guarantee for the price, for which guarantee he agreed to pay Singer a substantial consideration. It is manifest that he never regarded the title having been made to Devilbiss as making any difference in the transaction; and that he gave no credit upon any theory of partnership between Amos and the other defendants; but that he relied upon Amos' responsibility and the personal guarantee of Singer, *together with his rights under the mechanics' lien law, which had not at that time been repealed.*

If Devilbiss had never appeared in the transaction at all, and the leases had been made directly to Amos and the mortgages taken back from him without the intervention of any intermediary, it is difficult to see how the plaintiff's position could be any better, or different from what it is; and in neither aspect of the case can I see that any fraud has been perpetrated upon him, or that he has a right to complain of the form in which the transaction was carried out.

In further support of its theory that these leases and mortgages were fraudulent, the bill also alleges that no guarantees from Singer & Spalding to Amos, to indemnify against which the *mortgages profess on their face to have been given,* were ever in fact made—that no money passed—and the theory of pretended guarantees were devised to support a sham mortgage, one of the purposes being to secure a large antecedent indebtedness of Amos to Spalding.

Such is the allegation in the bill; but there is not one word in the testimony to sustain it. On the contrary, the uncontradicted testimony is that the guarantees were executed as they profess on the face of the mortgages to have been; and that money was advanced, in accordance with the terms of said guarantee, by Spalding and Savage as assignee of Singer, to the extent of $27,000. The written guarantees were all produced, as also the checks and other vouchers, and a full and detailed account of the whole transaction was given; and the uncontradicted testimony shows that after crediting Spalding and Savage with the entire proceeds of the sale under foreclosure, there is still due them for money advanced under these guarantees the sum of $19,000.

There is one other fact relied on by the plaintiff in support of the charge of fraud, based upon the erasures and alterations of the dates of the leases and mortgages of November 16th, 1897, and December 11th, 1897. But the testimony clearly shows how this happened, and makes it perfectly plain, the change was innocent, and wholly free from fraudulent design.

All these leases were signed by Devilbiss at the same time, viz.: on the 27th of October, when the first lease was made, and there is no trouble about this first lease; both it and the corresponding mortgage were executed on that day and duly recorded. But, as it was not intended that the other leases should be delivered until the work on the buildings intended to be covered by them respectively was begun, they were delivered to Spalding; and they were held by him until November 16th and December 11th, respectively, which were the proper times for them to be executed and put upon record, and they are properly dated therefore as of those dates.

The way the erasures and alterations came to be made was as follows: When the Justice took Devilbiss' acknowledgments of the three leases, he inadvertently filled in the dates of the second and third leases with the same date as the first lease, viz: October 27th; but when the second and third leases came to be finally executed, and his attention was called to the matter, he erased the dates of October 27th and made the proper dates over the eras-

ures. It is a mere seeming irregularity at the most, and in no event could have any effect upon the validity of the instruments, except as a step in the line of fraud, if fraud had been proved, and that these erasures and changed dates were necessary in its accomplishments. Moreover, had a fraudulent change of dates been intended, it is manifest the schemers would not have carried out the design so openly and free from attempt at concealment; as these alterations are aggressively obvious upon the most casual inspection.

I have gone over this allegation of fraud in fact, and the several grounds upon which it is rested, at perhaps unnecessary length; for it seems to me, that so far as fraud in the execution of the leases is concerned, and the claim to hold these defendants liable as partners, both contentions are *res adjudicata* under Judge Stockbridge's decision in the suit already alluded to.

II. The plaintiff further contends that these mortgages, even if not fraudulent in fact, are void at law, because the affidavit to the consideration is false (and a false affidavit avoids a mortgage as against creditors equally as if no affidavit had been made); and that they are really advance mortgages, within the prohibition of the statute.

If the first recital in the mortgage as to the consideration stood alone, there might be some force in this contention; but, taking the mortgage as a whole, I think the construction would be a most forced one. The contract between the parties was that Amos should furnish to Devilbiss all the materials that might be required for the construction of the houses, and that Spalding and Singer were to become sureties for Devilbiss, and were to guarantee the payment to Amos on account of the materials he was to furnish, to the extent of a certain sum, which was distributed between the several houses in specified proportions; and the first recital in the mortgage is that "whereas the said mortgagor (Devilbiss) is indebted unto the said mortgagees" in the gross sum guaranteed. Now, the mortgagees were absolutely bound for that sum under their guarantee to Amos as sureties for Devilbiss, and Devilbiss was absolutely bound to indemnify them to that extent, so that the recital above quoted, when taken in connection with the other recitals in the mortgage, in which the whole contract is fully set forth, is fully explained and could lead no one astray.

In fact, the mortgages are, as they appear on their face, strictly what they were intended to be—"indemnity Mortgages,"—and give full notice to every one of the terms of the contract of indemnity, and of the extent to which they were to be a lien upon the property in consideration of the contract of guarantee.

But, even if these mortgages are to be treated as *advance* mortgages, they are still strictly within the saving of the statute, which is in these words, "and no mortgage to secure future loans or advances shall be valid unless the amount or amounts of the same, and the times when they are to be made, shall be specifically stated in said mortgage."

Treating these mortgages as advance mortgages, therefore, they come clearly within the express terms of this saving clause of the statute; because not only is the aggregate of the advances distinctly stated, but the amounts of the advances, and the times when they are to be made, are all specifically stated.

As to the contention that the assignments from Singer to Savage were void under the statute of Elizabeth, there is nothing in the testimony to sustain it. They were made upon full consideration and in absolute good faith; and were received by Savage when he had not the slightest idea that Singer was indebted or embarrassed. Nor was there anything to put him upon inquiry, when he furnished the money to Singer from time to time called for by the guarantees to Amos, that Singer was insolvent, or had any intention of hindering or delaying his creditors. He was under no obligation to furnish money to Singer, and the fact that he did furnish it when called on, in order that the construction of the houses might go on, when he had at that time nothing to make by it, effectually refutes the idea of fraud in the transaction.

I can see nothing in the testimony to invalidate these assignments, either under the Statute of Elizabeth or upon general principles of the law.

The allegation in the bill that one of the objects of the mortgages was to secure an antecedent indebtedness due

230

by Amos to Spalding is wholly disproved by the testimony.

In no aspect of the case can I see that the plaintiffs are entitled to any of the relief prayed, and I will sign a decree dismissing the bill.